UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,                           MEMORANDUM & ORDER

                                        Plaintiff,           06-CV-3730 (NGG)

       -against-

ALL FUNDS ON DEPOSIT AT: CITIGROUP
SMITH BARNEY ACCOUNT No. 600-00338
HELD IN THE NAME OF KOBI ALEXANDER
and CITIGROUP SMITH BARNEY ACCOUNT
No. 600-27694 HELD IN THE NAME OF
KOBI J. ALEXANDER,

                                      Defendants.
----------------------------------------------------------------X
GARAUFIS, United States District Judge.

       Plaintiff United States of America ("Plaintiff" or the "Government") brings this civil

forfeiture action against Defendants Citigroup Smith Barney Account No. 600-00338 (the "338

Account") and Citigroup Smith Barney Account No. 600-27694 (the "694 Account")

(collectively, "Defendant Accounts").  Jacob "Kobi" Alexander ("Kobi") and, his wife, Hana

Alexander ("Hana") (collectively, "Claimants") have filed statements of interest respecting the

338 and 694 Accounts and, as a result, oppose this forfeiture action.  The Government has

moved, pursuant to Rules 12(b)(1), 12(c), and 56 of the Federal Rules of Civil Procedure, for (1)

an order striking Kobi's statement of interest pursuant to the fugitive disentitlement doctrine, and

(2) an order dismissing the Claimants' statements of interest on the ground that Claimants lack

standing.  Kobi and Hana have each submitted a motion to dismiss pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure and Rule E(2)(a) of the Supplemental Rules for Certain

Admiralty and Maritime Claims.[1]  At this time, the court considers all parties' motions.

For the reasons set forth below:  the Government's motion to strike the Claimants' statements of interest on the ground of lack of statutory standing is denied; the Government's motion to strike Hana's claim on the ground of lack of standing under Article III is held in abeyance pending discovery and further briefing; the Claimants' motion to dismiss is denied but the Government is directed to amend its Complaint; the Government's motion for summary judgment with respect to the fugitive disentitlement issue is granted.

## I.    BACKGROUND

In theory, addressing the factual and procedural background relevant to the instant motions is complicated by the different standards of review that are attached to motions under Rules 12(b)(1), 12(b)(6), 12(c), 56, and Rule E(2)(a).  With respect to Claimants' Rule 12(b)(6) motions, the court must accept all factual allegations in Plaintiff's pleadings as true and must draw inferences from those allegations in the light most favorable to Plaintiff.  United States v. The Baylor Univ. Med. Ctr., 469 F.3d 263, 267 (2d Cir. 2006).

With respect to Plaintiff's Rule 12(b)(1) motion, the court must accept all *undisputed* factual allegations as true and draw all reasonable inferences in the light most favorable to the non-moving party.  Robinson v. Malaysia, 269 F.3d 133, 140 (2d Cir. 2001).  To the extent the

---

[1] The Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions govern this civil forfeiture claim.  See 18 U.S.C. § 981(b)(2); Supplemental Rule A(1)(b) ("These Supplemental Rules apply to . . . (B) forfeiture actions in rem arising from a federal statute[.]); see also United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 n.3 (2d Cir. 1999).  At the time the instant motions were briefed, these rules were titled Supplemental Rules for Certain Admiralty and Maritime Claims.  Effective December 1, 2006, the rules were re-named the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions.  Hereinafter, these Rules will be referred to as the "Supplemental Rules."

parties dispute facts relevant to Plaintiff's Rule 12(b)(1) motion using evidentiary submissions, the court will consider the submitted evidence and, if necessary, decide the disputed factual questions.  See id. at 140 n.6 (in context of motion to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, district court "must" consult factual submissions "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction").

When deciding a motion for summary judgment under Rule 56, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Even in a fact-intensive case, however, the court will not accept as fact mere allegations lacking evidentiary support.  Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001).

In reality, the fact that this section addresses various motions with different standards of review is not problematic.  With very few exceptions, the facts material to the motions at issue are undisputed.  Where the court makes a factual finding, it will do so explicitly.

**The Criminal Action against Kobi**

On or about June 21, 2006, Kobi flew from the United States to Israel.  (Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl. 56.1 St.") ¶ 1.)[2]  At that time, the United States

---

[2] In his Rule 56.1 Statement, Kobi asserts that each fact included in the Government's Rule 56.1 Statement is not supported by admissible evidence and does not relate to a fact that is "material" to any issue to be tried.  I find paragraphs 2 through 13 of the Government's Rule 56.1 Statement (as correctly numbered in Kobi's Rule 56.1 Statement) to be supported by admissible testimony based on personal knowledge contained in the Kathleen A. Nandan

Attorney for the Eastern District of New York (the "USAO" or the "United States Attorney")

was investigating whether Comverse Technologies, Inc. ("Comverse" or "CTI") issued

backdated stock options and whether Kobi was involved in such a scheme. (Id. ¶ 2.) During

July 2006, the USAO had multiple conversations with Kobi's counsel concerning this

investigation. (Id. ¶ 3.) Kobi's counsel confirmed that Kobi would return to the United States

on July 28, 2006. (Id. ¶ 4; Declaration of Kathleen A. Nandan ("Nandan Decl.") Exh. 3.)

While Kobi's lawyers were representing to the Government that Kobi would return to the

United States on July 28, Kobi was wiring significant amounts of money from the 338 Account

to Israel. (Id. ¶ 7.) In July 2006, Kobi wired $57,000,000 from the 338 Account (including

$7,000,000 that had been wired to the 338 Account from the 694 Account) to accounts in Israel.

(Id.)

Kobi did not return to the United States on Friday July 28, 2006. (Id. ¶ 8.) On Monday

July 31, 2006, Magistrate Judge Cheryl L. Pollak issued a warrant for Kobi's arrest on the basis

of charges related to the alleged backdating scheme. (Id. ¶ 7.) In August 2006, the Federal

Bureau of Investigation declared Kobi a fugitive. (Id. ¶ 8.) On September 20, 2006, a Grand

---

Declaration. Nandan is the Assistant United States Attorney handling both the instant case and
the related criminal matter and clearly has personal knowledge of information contained in
paragraphs 2 through 13 of the Government's Rule 56.1 Statement. Although it is not clear from
the Nandan Declaration that she has personal knowledge as to the information contained in
paragraph 1 of the Government's Rule 56.1 Statement, that fact is not material to this motion.
Further, Kobi failed to controvert any of the statements contained in the Government's Rule 56.1
Statement. As a result, Kobi has admitted the facts contained in paragraphs 2 through 13 of the
Government's Rule 56.1 Statement. See Local Rule 56.1(c) ("[E]ach numbered paragraph in
the statement of material facts set forth in the statement required to be served by the moving
party *will be deemed to be admitted* for purposes of the motion *unless specifically controverted*
by a correspondingly numbered paragraph in the statement required to be served by the opposing
party.") (emphasis added).

Jury indicted Kobi on thirty-two counts, <u>United States v. Jacob Alexander</u>, Indictment No. 06-628 (NGG) (RER). (<u>Id.</u> ¶ 10.) On October 11, 2006, a Grand Jury issued a superseding Indictment and Magistrate Judge Ramon E. Reyes, Jr. issued a new warrant for Kobi's arrest. (<u>Id.</u> ¶ 12.)

On September 27, 2006, Kobi was arrested in Windhoek, Namibia pursuant to a provisional arrest warrant issued by the Namibian courts in response to a request by the United States. (<u>Id.</u> ¶ 11.) The United States' extradition request is currently pending in the Namibian courts. (<u>Id.</u> ¶ 15.)

**The Instant Civil Forfeiture Action**

On July 31, 2006, the first business day after July 28—the day on which Kobi's counsel assured the USAO that Kobi would return to the United States—the Government filed the instant Verified Complaint *In Rem* (the "Complaint"). The Complaint alleges that Kobi and the Defendant accounts were involved in Comverse's backdating of stock options:

> [Kobi] and others fraudulently back-dated options granted by CTI and, in so doing, made material misrepresentations to the SEC and the investing public. By backdating the options, [Kobi] generated millions of dollars in proceeds. [Kobi] then used the Defendant Accounts to launder the proceeds of the fraud by wiring nearly $60,000,000 to Israel in an attempt to conceal the proceeds from the U.S. authorities.

(Compl. ¶ 8.) According to the Complaint, Kobi "and others used fictitious names to generate hundreds of thousands of backdated options, which they then parked in a secret slush fund designed to evade the requirements of CTI's stock option plans. [Kobi] unilaterally awarded options from this slush fund to favored employees." (<u>Id.</u> ¶ 21.) Kobi is also alleged to have "reviewed and approved CTI's proxy statements, annual and quarterly filings, and stock option

plans, all of which contained material misstatements designed to conceal the fraudulent backdating scheme." (Id. ¶ 22.) As an example, the Complaint asserts that Comverse's April 30, 2002 Form 10-K inaccurately states that "all options have been granted at exercise prices equal to fair market value on the date of grant." (Id. ¶ 23.)

The Government alleges that Kobi "generated over $138 million in gross proceeds from the backdating scheme." (Id. ¶ 26.) At least some of these proceeds were allegedly placed in the 338 Account. (Id.) The Government also asserts that Kobi transferred money from the 694 Account to the 338 Account, "thereby commingling illegal proceeds with other funds." (Id. ¶ 27.)

The Complaint brings two causes of action. In the first cause of action, the Government claims that the Defendant Accounts were involved in money laundering in violation of 18 U.S.C. § 1956 and, as a result, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A). (Compl. ¶¶ 30-31.) In the second cause of action, the Government alleges that the "338 Account contains funds constituting the proceeds of" mail, wire, and securities fraud and, as a result, is subject to forfeiture pursuant to 18 U.S.C. §§ 981(c)(1)(C) and 984. (Compl. ¶ 33.)

On the day this action was filed, July 31, 2006, Magistrate Judge Pollak issued a Warrant for the seizure of the Defendant Accounts. (Nandan Decl. ¶ 10, Exh. 5.) At the time the Defendant Accounts were seized, there was approximately $47 million in the 338 Account and $2.4 million in the 694 Account. (Morvillo Aff. ¶ 9.)

## II. DISCUSSION

The Government moves to (1) strike the Claimants' statements of interest on standing grounds and (2) strike Kobi's statement of interest pursuant to the fugitive disentitlement

doctrine.  Claimants move to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a cause of action.

The parties agree that Rule G(8)(c) of the Supplemental Rules requires the court to rule upon the motion to strike for lack of standing before considering the Claimants' motions to dismiss.  (Government's Memorandum of Law in Opposition to Claimants' Motion to Dismiss ("Gov't MTD Opp.") at 2; Kobi's Reply Memorandum of Law in Further Support of Kobi's Motion to Dismiss ("Kobi MTD Rep.") at 3.)  Rule G(8)(c) provides that a motion to strike a claim for lack of standing "must be decided before any motion by the claimant to dismiss the action."  As a result, the court shall consider the motion to strike for lack of standing first.

The question of whether the court should consider the Government's motion for summary judgment on its fugitive disentitlement doctrine claim before Kobi's motion to dismiss is a more difficult question.  I do not understand the Government to be asserting that the fugitive disentitlement motion should be considered first.  The Government states that "the Court should consider the Claimants' motion [to dismiss] only if it denies the government's motion to strike their claims."  (Gov't MTD Opp. at 2.)  Although the Government's motion for summary judgment with respect to the fugitive disentitlement issue is contained in motion papers titled "Motion to Strike the Claims Filed by Jacob "Kobi" Alexander and Hana Alexander," in reality, the fugitive disentitlement motion is a different motion on a different ground (fugitive disentitlement versus standing) made pursuant to a different rule (Rule 56 as opposed to Rule 12).

In contrast to the Government's vague argument, Kobi specifically argues that the motion to dismiss should be considered prior to the fugitive disentitlement motion.  (Kobi Standing

Mem. at 21 n.10; Kobi MTD Rep. at 3.)   Kobi also points to a number of cases in this Circuit in which courts considered a motion to dismiss prior to considering fugitive disentitlement.  See United States v. 479 Tamarind Drive, No. 98 Civ. 2279 (RLC), 2005 WL 2649001, at *2 n.3, *3 n.5 (S.D.N.Y. Oct. 14, 2005) (court considered claimant's motion to dismiss prior to considering fugitive disentitlement); United States v. $138,381, 240 F. Supp. 2d 220, 224-26 (E.D.N.Y. 2003) (court considered Government's motion for summary judgment on the merits prior to considering fugitive disentitlement).  No court in this Circuit appears to have explicitly considered which motion should be given priority.  In any event, as the Government is not arguing that the court should consider the fugitive disentitlement motion prior to Kobi's motion to dismiss, this court shall consider the motion to dismiss first.  As a result, the court not need reach the question of which motion should be considered first.

A.     Standing

The Government argues that both Claimants' claims should be dismissed for lack of statutory standing and Hana's claim should also be dismissed for lack of standing under Article III of the United States Constitution.  (Government's Memorandum of Law in Support of the United States' Motion to Strike the Claims ("Gov't Standing Mem.") at 12.)

1.     Standard of Review

The Government moves, under Rules 12(b)(1) and 12(c), to strike the Claimants' statements of interest on the ground that Claimants lack standing.  This court will consider the motion pursuant to Rule 12(b)(1).  "It is well ingrained in the law that subject-matter jurisdiction can be called into question *either* by challenging the sufficiency of the allegation *or* by challenging the accuracy of the jurisdictional facts alleged."  Gwaltney of Smithfield, Ltd. v.

Chesapeake Bay Found., Inc., 484 U.S. 49, 68, 108 S. Ct. 376 (1987) (Scalia, J., concurring in part and concurring in the judgment) (citations omitted; emphasis in original). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Robinson v. Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) (internal citations and quotation marks omitted). If the parties present factual evidence that is "relevant to the jurisdictional question," the court *may* consider such evidence. Id.; accord Goonewardena v. New York, 475 F. Supp. 2d 310 (S.D.N.Y. 2007). The district court *must* consider facts outside the pleadings "if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction." Robinson, 269 F.3d at 141 n.6. The party asserting subject-matter jurisdiction bears the burden of proving by a preponderance of the evidence that jurisdiction exists. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); accord Goonewardena, 475 F. Supp. 2d at 310.

### 2. Standing in Civil Forfeiture Actions

In order to assert a claim over property that is subject to a civil forfeiture action, a claimant "must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999).

### 3. Statutory Standing

The Government argues that Claimants have failed to gain statutory standing because they failed to comply with the requirements set out in Rule C(6) of the Supplemental Rules. Rule C(6) requires claimants in civil forfeiture actions to file a verified statement identifying

their interest or right in the property subject to forfeiture. Specifically, the Government argues

that the Claimants' claims were defective because—instead of being verified by

Claimants—they were verified by Claimants' counsel and, then, only on information and belief.

(Gov't Standing Mem. at 17.) Claimants argue that (1) the claims submitted met the

requirements of Rule C(6) and, even if the original claims did not meet such requirements, (2)

Claimants should be permitted to amend their claims to comply with Rule C(6). (Kobi's

Memorandum of Law in Opposition to the Government's Motion to Strike His Claim ("Kobi

Standing Opp.") at 8-14; Hana's Memorandum of Law In Support of Opposition to the

Government's Motion to Strike Her Claim ("Hana Standing Opp.") at 4-8.) As I find that

Claimants should be permitted to amend their statements of interest, I do not reach the question

of whether the Claimants' initial statements of interest comply with the pleading requirements.[3]

On or about October 10, 2006, Kobi executed an Amended Verified Statement of

Interest. (Affidavit of Robert G. Morvillo ¶ 3, Exh. C.) Similarly, on November 9, 2006, Hana

executed an Amended Verified Statement of Interest, which was provided to the Government on

November 10, 2006. (Strassberg Affidavit ¶ 2, Exh. A.) The Government does not argue that

the amended statements of interest failed to meet the pleading standards. Instead, the

Government argues only that Claimants should not be permitted to amend their statements of

interest. (Reply Memorandum of Law in Support of The United States' Motion to Strike the

---

[3] I do note that the issue of whether the statements of interest were adequately pled may be complicated by the fact that on December 1, 2006, Rule C(6) was amended and Rule G(5) was newly created, which collectively had the effect of requiring that a claimant personally sign the statement of interest. The prior version of Rule C(6), which was in effect at the time Claimants filed their original Statements of Interest, permitted an attorney to sign a statement of interest on behalf of a claimant.

Claims Filed by Jacob "Kobi" Alexander and Hana Alexander ("Gov't Standing Rep.") at 9-11.)

The parties agree that amendments to statements of interest should be liberally permitted, absent evidence of bad faith undue delay, or prejudice. (Gov't Standing Rep. at 10; Kobi Standing Opp. at 12-13; Hana Standing Opp. at 7.) Although "[a] district court may require claimants in forfeiture proceedings to comply strictly with the rule's requirements in presenting its claims to the court. . . . the court may exercise its discretion by extending the time for the filing of a verified claim. United States v. $125,938.62, 370 F.3d 1325, 1329 (11th Cir. 2004) (internal quotation marks omitted). "'[A]mendments should be liberally permitted to add verifications to claims originally lacking them.'" United States v. 1982 Yukon Delta Houseboat, 774 F.2d 1432, 1436 (9th Cir. 1985) (quoting 7A J. Moore & A. Pelaez, Moore's Federal Practice, P C. 16, at 700.16 (2d ed. 1983)); see also United States v. U.S. Currency in the Amount of $103,387.27, 863 F.2d 555, 561-62 (7th Cir. 1988) ("While this court requires that meticulous attention be paid to detail, it also believes that amendments should be liberally permitted to add verifications to claims originally lacked them, provided that the amendment would not undermine the goals underlying the time restriction and verification requirements of Rule C.") (internal citations and quotation marks omitted).

In deciding whether to permit such an untimely amendment, courts consider the following factors:

> [T]he time the claimant became aware of the seizure, whether the Government encouraged the delay, the reasons proffered for the delay, whether the claimant had advised the court and the Government of his interest in defendant before the claim deadline, whether the Government would be prejudiced by allowing the late filing, the sufficiency of the answer in meeting the basic requirements of a verified claim, and whether the claimant timely petitioned for an enlargement of time. . . . [as well as] the amount

seized[.]

$125,938.62, 370 F. 3d at 1329 (internal quotation marks omitted).

Although courts will consider all of these factors, several Circuit courts have held that it is an abuse of discretion to preclude a claimant from amending his statement of interest where (1) the amendment would not cause the Government any prejudice and (2) the claimant made a good faith effort to file a claim.  See id. at 1330 (11th Cir.) (district court abused its discretion in denying motion to amend where the government was on notice as to the identities of claimants and their interest in the accounts at issue and claimants' only failure was to comply with Rule C(6)'s technical requirements); $103,387.27, 863 F.2d at 562-63 (7th Cir.) (reversing the district court's denial of a motion to amend a statement of interest and holding that "[w]here the claimants have made a good-faith effort to file a claim and where the government can show absolutely no prejudice by the granting of an extension of time, we think it an abuse of discretion to deny an extension of time to amend a claim of ownership, absent any countervailing factors."); 1982 Yukon Delta Houseboat, 774 F.2d at 1436 (9th Cir.) (denial of motion to amend the complaint constituted an abuse of discretion where the government was aware of the claimant's ownership allegations and the parties had engaged in good faith in substantial discovery); see also United States v. $138,381.00, 240 F. Supp. 2d 220, 230 (E.D.N.Y. 2003) ("Courts typically exercise their discretion [to permit an amendment] when claimants have timely placed the court and government on notice of their interest in the property and intent to contest the forfeiture, recognizing both the good-faith effort put forth and the lack of prejudice to the government under such circumstances.").  This rule results from the fact that, in these circumstances, the policy purposes motivating Rule C(6) are met:

12

> [W]here a claimant has made known to the court and the
> government his interest in the subject property (in this case, by
> filing an answer asserting ownership of the property) before the
> deadline set for the filing of a proper claim has passed, the policy
> interest underlying the requirement of a timely verified claim
> would not be injured by allowing the claimant to perfect his claim
> by subsequent verification.

1982 Yukon Delta Houseboat, 774 F.2d at 1436.

In this case, there is no question that, well within the time required by Rule C(6), the Government and the court were provided notice that Claimants would be asserting interests in the Defendant Accounts. In fact, the Government acknowledges that it has not suffered any prejudice as a result of the technical defects in the Claimants' original statements of interest. (Gov't Standing Rep. at 10 ("The government does not claim prejudice or undue delay in this case[.]").) The Government's only argument that this case does not fall within those cases in which courts excused a technical deficiency in the statement of interest is that Claimants engaged in bad faith: "The government argued, and the Claimants have not refuted, that they did not verify their original claims because doing so would have disclosed their whereabouts. This attempt to manipulate the system and delay the proceedings (by filing a claim that, without disclosing their whereabouts, could not be litigated) constitutes bad faith." (Gov't Standing Rep. at 10.) The Government does not cite any precedent in support of this argument and whether the bad faith standard is met when an individual fails to personally verify a claim in order to conceal his whereabouts may be a question of first impression.

The Government may be correct that Claimants instructed their attorneys to file the original statements of interest instead of filing statements of interest personally verified by Claimants so that they would not have to disclose their whereabouts. At this time, however, I

13

decline to find that Claimants had such a malicious purpose. At the time the Claimants' counsel submitted the original statements of interest, Rule C(6)(a)(ii) specifically permitted an attorney to file the statement of interest on behalf of the claimant. The mere fact that Claimants decided to exercise the option of having their counsel verify the statement of interest is not a sufficient basis to infer that claimants had such a motive in mind.

When the facts are considered as a whole, however, Claimants conduct is, in the least, suspicious. Kobi permitted his counsel to represent that he would return to the United States by July 28, 2006, and has yet to return. Further, Kobi removed a large fortune from United States jurisdiction at a time when he knew the Government was investigating the backdating of options at Comverse. Claimants may very well have had no intention of returning to the United States at the time he permitted his attorney to represent to the Government that he would return on July 28, 2006. Claimants' decision to have their counsel verify their statements of interest may very well be a part of this alleged pattern of evasion of United States law of which Kobi was a beneficiary during the many years he enjoyed enormous prosperity as a senior Comverse executive.

Even though there is evidence to support a finding that Claimants had a malicious intent, the reality is that Claimants' conduct has not delayed disposition of this case. There is no indication that Claimants' initial decision to have their counsel verify the original statements of interest in any way delayed the disposition of this case. There is no indication that Claimants have failed to comply with their discovery obligations.[4] It may be that malicious intent alone is

---

[4] Claimants should not take this as a signal that this court will not overlook any prospective failure to comply with their discovery obligations. In the event that this case reaches discovery, any failure by Claimants to comply with their discovery obligations may be met with

sufficient to find that a party engaged in the type of "bad faith" that warrants denial of a motion to amend a pleading. In this case, however, because Claimants' decision to permit their counsel to verify their statements of interest did not materially delay this litigation, I decline to find that Claimants engaged in "bad faith" by directing their counsel to complete the original statements of interest. As a result, Claimants are permitted to amend their statements of interest and I deem the Amended Verified Statements of Interest timely.[5]

### 3. Article III Standing

The Government argues that Hana lacks Article III standing to assert a claim over the Defendant Accounts. Hana argues that she has standing on the basis of the following facts:

> The basis of my interest is that I am the lawful wife of Jacob "Kobi" Alexander, the party that holds legal title to the defendant bank accounts, and that I had involvement with and directed activity in one of the accounts, including but not limited to, that I had and exercised the right to use funds from the account, both for my benefit and my three minor children's benefit.

(Strassberg Aff. Exh. A ¶ 2.)

Under Article III of the Constitution, federal courts' subject-matter jurisdiction is limited to "Cases" and "Controversies," which exist only when a litigant has "a 'sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy.'" United

---

severe sanctions, to the extent permitted by the applicable rules.

[5] The Government argues that the fact that Claimants were in hiding at the time the original statements of interest were filed means "the Court must determine whether a statement of interest filed by a claimant who is in hiding (and presumably does not intend to willingly come out of hiding) is validly filed." (Gov't Standing Rep. at 10.) The Government is mistaken on this point. Even if the original statements of interest were invalid (either because Claimants were in hiding or for some other reason), the court has deemed the Amended Verified Statements of Interest timely. As a result, the validity of the original statements of interest is irrelevant.

States v. Cambio Exacto, 166 F.3d 522, 526-27 (2d Cir. 1999) (quoting Sierra Club v. Morton, 405 U.S. 727, 731 (1972)).  When it comes to constitutional standing, "[w]hile ownership or possession of property may provide evidence of standing, and in some circumstances act as, in effect, a surrogate for an inquiry into whether there is injury direct enough and sufficient enough to sustain standing, it is *injury* that is at the heart of the standing question."  Id. at 527.  The "fundamental inquiry is whether 'the [claimants] [have] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'"  Id. (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).  As a result, "[t]o demonstrate standing under Article III . . . a litigant must allege a distinct and palpable injury to himself, that is the direct result of the putatively illegal conduct of the adverse party."  Id. (internal citations and quotation marks omitted).

The Cambio Exacto court recognized that numerous other Second Circuit cases discussed Article III standing in the forfeiture context in terms of whether the claimant owned or possessed the property being seized.  Id. at 527.  This is because "'an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property.'"  Id. (quoting United States v. $515,060.42 in U.S. Currency, 152 F.3d 491, 497 (6th Cir. 1998)).  Ownership, however, "is only evidence of direct injury" and an individual who does not own the property at issue can still possess constitutional standing in a forfeiture proceeding.  Id. at 528.

Standing in the civil forfeiture context is somewhat different from standing in other cases pending before federal courts.  In the typical case, "'[s]ince [elements of standing] are not mere

pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" United States v. $557,933.89, 287 F.3d 66, 79 (2d Cir. 2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).  The civil forfeiture context, however, is different:

> [I]n a civil forfeiture action the *government* is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated.  If the government fails to meet its burden of proof (formerly probable cause, now preponderance), the claimant need not produce any evidence at all—i.e., the claimant has no 'case' that he must present or 'elements' to which he bears the burden of proof.  The function of standing in a forfeiture action is therefore truly threshold only—to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture.  Thus, the only question that the courts need assess regarding a claimant's standing is whether he or she has shown the required facially colorable interest, not whether he ultimately proves the existence of that interest.

Id. (emphasis in original and internal citation and quotation marks omitted).  In fact, in *dicta*, the Second Circuit went so far as to note that "because 'the party invoking federal jurisdiction bears the burden of establishing' standing, Lujan, 504 U.S. at 561, 112 S.Ct. 2130, it might very well be argued that, at least as far as Article III—as opposed to statutory—standing goes, the claimant bears no burden at all, as it is really the government which is invoking the power of the federal courts to effect the forfeiture."  $557,933.89, 287 F.3d at 79 n.9.

Hana has failed to provide the court sufficient information to make the standing inquiry.  Clearly, Hana has no ownership interest in the Defendant Accounts.  See Musso v. Ostashko, 468 F.3d 99, 105-06 (2d Cir. 2006) ("A spouse without legal title has no interest in marital

property prior to obtaining a judgment creating such an interest."); Galtieri v. Kelly, 441 F. Supp. 2d 447, 456 (E.D.N.Y. 2006) (holding that a wife of a policeman lacks standing to challenge the New York City Police Department's decision to comply with a New Jersey court order to garnish the policeman's disability benefits). The Second Circuit, however, has made clear that an individual does not have to actually own property in order to have standing to contest the seizure of it. See Cambio Exacto, 166 F.3d at 527-28 (holding that claimants had standing in civil forfeiture proceeding without reaching the question of whether claimants owned the property because "[i]t is clear . . . that [claimants] have produced other evidence of a distinct and palpable injury sufficient to give them standing under Article III.") (internal quotation marks omitted).

Those courts to have considered the issue have found that an individual has standing to contest a forfeiture action against his spouse's property if the individual can show that he possessed the property itself, as opposed to merely having a familial connection to the owner of the property. See United States v. $122,043.00, 792 F.2d 1470, 1473 (9th Cir. 1986) (wife has standing to contest forfeiture of husband's cash where wife was in physical possession of the currency at the time it was seized); United States v. Contents of Account Numbers 208-06070, 847 F. Supp. 329, 333 (S.D.N.Y. 1993) (finding material question of fact as to whether husband had standing to challenge forfeiture of wife's bank account where (1) he was permitted access to and (2) had authority to sign his wife's name and make withdrawals from and deposits to his wife's account). In 208-06070, the claimant-husband submitted a statement explaining that he had authority to access an account in his wife's name, including authority to make withdrawals and deposits, and that the couple "shared jointly in their property holdings." 208-06070, 847 F.

18

Supp. at 333. The court explained that "[t]hese *statements* raise a genuine issue of material fact as to [the husband's] standing to challenge the forfeiture of" accounts in his wife's name. Id. The 208-06070 court clearly found that it was the husband's statements concerning specific possessory interests in the account held in his wife's name that created a material question of fact as to whether the husband had standing. I read 208-06070 to find that marital status, in and of itself, is insufficient to confer standing on one spouse to challenge the forfeiture of an account held in the name of the other spouse.

I find 208-06070 and $122,043.00 persuasive: where an individual has a sufficient possessory interest in his spouse's property, see, e.g., Cambio, 166 F.3d at 527-28 ("naked claim of possession . . . does not . . . impart Article III standing") (internal quotation marks omitted), the individual has standing to contest a forfeiture action relating to the property. A marital or familial relationship alone, however, is insufficient to establish an individual's standing to contest a forfeiture proceeding involving the spouse or family member's property. The mere fact that an individual is related to a property owner in no way conveys the type of ownership or possessory interest that is sufficient to establish standing.[6]

In this case, however, Hana has provided insufficient information to determine whether she has a possessory interest in the property at issue. Hana states that she "had involvement with and directed activity in one of the accounts, including but not limited to, that [she] had and exercised the right to use funds from the account, both for [her] benefit and [her] three minor

_____

[6] Hana does not cite any authority in support of the proposition that the Alexander children have standing to assert a claim in this matter. Nor does Hana allege that the Alexander children have any possessory or ownership interests in the Defendant Accounts. As a result, I find that the children do not have standing to assert a claim and, thus, Hana does not have standing as a representative of the children's interests.

children's benefit." (Strassberg Aff. Exh. A ¶ 2.) This statement is remarkably vague. In fact, it leaves this court with far more questions than answers: Which of the two Defendant Accounts is Hana referring to? What does Hana mean by having "involvement with" and "direct[ing]" activity in one of the accounts? How did Hana "exercise[] the right to use funds from the account"?

Hana is represented by Goodwin Procter LLP, a large and sophisticated law firm. Ordinarily, I might simply find that when such a law firm submits a standing allegation as vague and conclusory as this one, the claim should be dismissed as a matter of law. In this case, in fact, the allegation is vague to the point where it appears intentionally designed to obfuscate the nature of Hana's connection to the Defendant Accounts. Despite the flagrant shortcomings of this allegation, in the interest of moving this case forward, I direct the parties to conduct discovery on the issue of Hana's standing.

Because standing is a threshold question, this discovery shall commence immediately. Discovery on this issue shall be completed by October 12, 2007. Although depositions may not be necessary, the Government is free to depose Hana on this issue. Any and all depositions are to occur in the Eastern District of New York. If, after discovery, there is still a dispute as to whether Hana has standing, the parties shall brief the issue. On or before October 17, 2007, Hana shall submit a letter-brief not exceeding five pages in length in support of her claim that she has standing. Hana shall also submit any affidavits, documents, and/or other factual evidence supporting her standing claim. On or before October 22, 2007, the Government shall submit a letter-brief not to exceed five pages in length in opposition to Hana's standing claim. The Government is also free to make a factual submission if it so desires.

## B.     Claimants' Motion To Dismiss

Claimants argue that the Government's first cause of action (seeking forfeiture of both the 338 and 694 Accounts) and second cause of action (seeking forfeiture of the 338 Account) should be dismissed.[7]  Each cause of action will be considered in turn.

### 1.     Standard of Review

The Complaint need only "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supplemental Rule G(2)(f). The Advisory Committee Note cites to United States v. Mondragon, 313 F.3d 862, 865 (4th Cir. 2002), as the basis for the standard.  In reference to Rule G(2)(f)'s predecessor, Mondragon explained that this standard "is plainly written and means precisely what it says."  Mondragon, 313 F.3d at 865 (internal quotation marks omitted).

Further, "the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  Supplemental Rule G(8)(b).  The Government asserts that this rule permits the court to look beyond the complaint when considering a motion to dismiss.  (Gov't MTD Opp. at 15 n.9)  Claimants argue that the court is not permitted to consider material contained in the Government's "offer of proof" on a motion to dismiss.  (Kobi MTD Rep. at 8-9, 12-13.)

---

[7] Instead of submitting separate arguments in support of her motion, Hana joined the arguments made in Kobi's motion papers.  (See Memorandum of Law in Support of Hana Alexander's Motion to Dismiss the Complaint In Rem at 1 ("Because the issues pertinent to Ms. Alexander's motion to dismiss the Complaint In Rem are the same as those addressed in [Kobi's] motion to dismiss the Complaint In Rem [ ], and in order to avoid duplicative arguments, Ms. Alexander incorporates and relies upon the memorandum of law, affidavit, and other papers submitted by Mr. Alexander in support of his motion.")  As a result, although citations in this section will be to Kobi's motion papers, they reflect arguments made by both Kobi and Hana.

It is not entirely clear how to read Supplemental Rule G's requirement that a complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial" to be consistent with Rule G's proscription of dismissal of a complaint "on the ground that the government did not have adequate evidence at the time the complaint was filed." In any event, as discussed in further detail *infra*, the court need not reach this issue because the court is directing the Government to amend its Complaint. When the Government amends its Complaint, it is free to allege any of the facts contained in its "offer of proof."

## 1. First Cause of Action

### (a) Proceeds

Claimants argue that the first cause of action—which seeks forfeiture of both the 338 and the 694 Accounts—should be dismissed because the statutory basis for the first cause of action, 18 U.S.C. § 981(a)(1)(A), provides for forfeiture of net proceeds of the illegal scheme as opposed to gross proceeds. (Kobi MTD Mem. at 10-14; Kobi MTD Rep. at 13-6.) The Government does not appear to respond directly to this argument. Instead, the Government argues that, in general, it is entitled to seek gross proceeds of the 338 Account pursuant to 18 U.S.C. § 981(a)(1)(C). (Gov't MTD Opp. at 3-13.) The first cause of action (the only cause of action to seek forfeiture of the 694 Account), however, seeks forfeiture under Section 981(a)(1)(A). It is not clear whether the Government (1) intends to abandon the first cause of action or (2) is seeking to amend the first cause of action to include Section 981(a)(1)(C) as a basis for it.

What is clear, however, is that, at this time, the Government is not asserting that Section

22

981(a)(1)(A) provides a basis for seizing gross proceeds contained in the Defendant Accounts. It is similarly clear that Claimants are not challenging the proposition that Section 981(a)(1)(C) permits the seizure of gross proceeds. (Kobi MTD Mem. at 22 n.14.) As a result, at this time, the court will not reach the questions of whether either Sections 981(a)(1)(A) or 981(a)(1)(C) permits seizure of gross proceeds. Instead, the wisest course of action is to grant the Government's request to amend the Complaint. (See Gov't MTD Opp. at 22-23.) Claimants do not oppose this request. (Kobi MTD Rep. at 14 ("Mr. Alexander does not object to the government amending the Complaint.").) As a result, the Government is granted leave to amend the Complaint to (1) remove the first cause of action, (2) include Section 981(a)(1)(C) as a basis for the first cause of action, (3) clarify that the first cause of action seeks only those "proceeds" that are subject to seizure under Section 981(a)(1)(A), and/or (4) modify the Complaint in any other way not inconsistent with this opinion.

### (b)        *Claimants' Remaining Arguments in Support of Dismissing the First Cause of Action*

Claimants make a number of other substantive arguments in support of their motion to dismiss the first cause of action. Claimants argue that the Defendant Accounts lack the "'substantial connection' to the alleged money laundering violation necessary to permit forfeiture on a facilitation theory." (Kobi MTD Mem. at 14-17; Kobi MTD Rep. at 6-13.) Claimants also argue that the Complaint fails to allege concealment, which Claimants assert is an essential element of a money laundering forfeiture claim. (Kobi MTD Rep. at 1-2.) Because (1) it is unclear whether the Government wishes to pursue a money laundering forfeiture claim and (2) if the Government is interested in pursuing such a claim, the Government will be re-pleading

the claim, the court will not reach these arguments at this time.  Claimants remain free to raise

these issues in any subsequent motion to dismiss.[8]

### 2.      Second Cause of Action

#### (a)      338 Account Funds Connection to Alleged Fraud

Claimants argue that the second cause of action should be dismissed because the

Complaint does not allege that the 338 Account contained funds obtained "as a result of" the

alleged mail, wire, and securities fraud.  (Kobi MTD Mem. at 22-23; Kobi MTD Rep. at 2, 7-9.)

The Government responds by arguing that because Section 981(a)(1)(C) permits the seizure of

gross proceeds, the Government "is entitled to seek the forfeiture of all property traceable to

[Kobi]'s backdating scheme deposited into the 338 Account, not just net profits."  (Gov't MTD

Opp. at 14.)

The parties agree that the "proceeds" that the Government is entitled to seize in the

second cause of action is defined in 18 U.S.C. § 981(a)(2)(C).  (Kobi MTD Mem. at 22.)  Under

this provision, "the term 'proceeds' means property of any kind obtained directly or indirectly, as

the result of the commission of the offense giving rise to forfeiture, and any property traceable

thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. §

981(a)(2)(C).  Claimants do not challenge the proposition that Section 981(a)(2)(C) permits the

Government to seize monies gained through the exercise of options that were procured through

fraud.  Instead, Claimants argue only that the Complaint fails to allege that the funds contained

in the 338 Account resulted from the exercise of backdated options.

---

[8] The Government also notes its intent to amend the Complaint to include a cause of
action for forfeiture under 18 U.S.C. § 1957.  (Gov't MTD Opp. at 21.)  The Government may
include such a claim in the amended complaint.

The Complaint alleges as follows:

> [Kobi] generated over $138 million in gross proceeds from the backdating scheme. In January 2006 alone, [Kobi] generated over $10.7 million in gross proceeds from the sale of CTI stock obtained through the exercise of the backdated options. The proceeds of these January 2006 sales were placed into the 338 Account.

(Compl. ¶ 26.) Claimants argue that this allegation can be read to assert only that $10.7 million in gross proceeds from the alleged scheme were deposited in the 338 Account. It is clear from the face of the Complaint that the January 2006 figure is intended as nothing more than an example of instances in which Kobi deposited proceeds from the exercise of backdated options into the 338 Account. That being said, the Complaint does not explicitly state that any other proceeds from the backdating scheme were deposited into the 338 Account.

In its brief, the Government cites to sources outside the Complaint in support of its assertion that the 338 Account is composed entirely of proceeds from the fraud. In the Grand Jury indictment, the Government alleges that all of the Comverse stock options issued to Kobi between 1998 and 2001 were backdated. (Nandan Aff. Exh. 1 ¶ 11.) In its brief, the Government identifies $56.6 million of stock options contained in the 338 Account, many if not all of which appear to have been backdated stock options. (Gov't MTD Opp. at 1-16.) In any event, because the Complaint identifies (1) the fraud scheme at issue and (2) the specific accounts in which it is alleging the proceeds are contained, the Complaint places Claimants on notice of the basis for their forfeiture claim and the location of evidence in support of the claim.

Further, the Government has identified its basis for tracing the funds in the 338 Account to the fraud scheme: "based upon its preliminary analysis, the government believes that it can establish the forfeitability of the entire account under the 'intermediate balance rule,' a tracing

methodology whereby the tainted funds deposited into an account are presumed to remain in the account unless the account balance is depleted in the interim."  (Gov't MTD Opp. at 17.)

It appears the Government has identified sufficient allegations to adequately plead that the 338 Account is composed entirely of proceeds from the fraud scheme.  Some of these allegations, however, are not contained in (1) the Verified Complaint or (2) admissible evidence. As a result, I direct the Government to amend the Complaint to include "sufficiently detailed facts to support a reasonable belief that the government will be able to" establish at trial that the entire 338 Account is subject to forfeiture.[9]

### (b)  Section 984 Claim

The second cause of action seeks forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.  (Compl. ¶ 33.)  Claimants argue that the second cause of action should be dismissed to the extent it is predicated upon 18 U.S.C. § 984 "because the Complaint fails to allege that the 338 Account contained 'guilty' property, as opposed to lawful profit from option sales."  (Kobi MTD

---

[9] Kobi argues that the Government has not sufficiently pled in the Complaint that all of the money Kobi gained by exercising options constitutes proceeds from the backdating scheme. (Kobi MTD Rep. at 9 ("[T]he government now contends that *all* of the money Mr. Alexander obtained by exercising options constitutes proceeds from the backdating scheme.") (emphasis in original).)  Kobi argues that the Government should be required to specifically plead this theory in an amended Complaint:  "If the government wants to argue that all of Mr. Alexander's proceeds from exercising options are forfeitable because he would not have received any options but for the alleged violations, it should be required to replead and present this incredible theory in an amended complaint."  (Id.)  The court understands the Government to be asserting that Section 981(a)(1)(C) provides for the forfeiture of all proceeds resulting from Kobi's exercise of backdated options—as opposed to all proceeds resulting from Kobi's exercise of *all* Comverse options.  In any event, the amended complaint should clarify (1) which monies are subject to forfeiture and (2) the statute or other legal ground for each forfeiture claim.  See Supplemental Rule G(2) (requiring a complaint "identify the statute under which the forfeiture action is being brought" and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.").

Mem. at 23-24.)  This argument is, in fact, the same argument that the second cause of action

fails to allege that the 338 Account contains funds obtained through the exercise of backdated

options procured via fraud.  As a result, this argument was addressed *supra*.[10]

### C.      Fugitive Disentitlement

The Government moves for summary judgment on their claim that Kobi's statement of

interest should be dismissed pursuant to the fugitive disentitlement doctrine.  Kobi opposes this

motion.

### 1.      Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e.,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "A fact is

'material' for these purposes if it might affect the outcome of the suit under the governing law.

An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Holtz, 258 F.3d at 69 (citations and quotation marks omitted).

The moving party bears the burden of establishing the absence of a genuine issue of

material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  If the moving party

---

[10] Claimants also argue that "even assuming that facts were alleged that would justify the
application of section 984, that section permits forfeiture of the property actually involved in the
offense, and not, as the government appears to contend, the entire contents of a bank account.  In
other words, the substitute assets theory of forfeiture, like the proceeds theory, is capped to the
proceeds actually deposited into the account." (Kobi MTD Mem. at 24.)  The Government does
not appear to contest this point.  The parties are free to re-raise it in any subsequent motion to
dismiss if such a motion is made.

has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

### 1. Fugitive Disentitlement Doctrine

In 1996, the Supreme Court held that courts could not use the common law fugitive disentitlement doctrine to bar fugitives from pursuing claims in civil forfeiture proceedings. Degen v. United States, 517 U.S. 820 (1996). In response, Congress enacted the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), a statutory fugitive disentitlement doctrine that accomplished precisely the result that the Supreme Court concluded could not be achieved through the common law:

> (a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person–
>> (1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution–
>>> (A) purposely leaves the jurisdiction of the United States;
>>> (B) declines to enter or reenter the United States or submit to its jurisdiction; or

28

(C) otherwise evades the jurisdiction of the court in
which a criminal case is pending against the person;
and

(2) is not confined or held in custody in any other
jurisdiction for commission of criminal conduct in that
jurisdiction.

24 U.S.C. § 2466(a).

The Second Circuit has held that the statute clearly sets out the elements of a

disentitlement claim:

> By its terms, the statute identifies five prerequisites to
> disentitlement: (1) a warrant or similar process must have been
> issued in a criminal case for the claimant's apprehension; (2) the
> claimant must have had notice or knowledge of the warrant; (3) the
> criminal case must be related to the forfeiture action; (4) the
> claimant must not be confined or otherwise held in custody in
> another jurisdiction; and (5) the claimant must have deliberately
> avoided prosecution by (A) purposefully leaving the United States,
> (B) declining to enter or reenter the United States, or (C) otherwise
> evading the jurisdiction of a court in the United States in which a
> criminal case is pending against the claimant.

Collazos v. United States, 368 F.3d 190, 198 (2004). "Even when these requirements are

satisfied, however, Section 2466, does not mandate disentitlement; the ultimate decision whether

to order disentitlement in a particular case rests in the sound discretion of the trial court." Id.

In this case, it is clear that all five elements of the statutory fugitive disentitlement

doctrine have been easily satisfied. In fact, Kobi does not argue to the contrary. Each element

will be considered in turn. First, four separate warrants have been issued for Kobi's arrest.

(Nandan Decl. ¶¶ 9, 14-16.) Second, although the record does not appear to contain any direct

evidence that Kobi knows of one or more of the warrants for his arrest issued in this District,

there is more than sufficient circumstantial evidence to infer such knowledge. Kobi clearly

gained knowledge of at least one of the United States warrants ordering his arrest when he was

arrested in Windhoek, Namibia, pursuant to a request by the United States, or during the subsequent extradition proceedings. (<u>See</u> Nandan Decl. ¶¶ 15, 17.) After all, Kobi was aware of the United States Attorney's investigation into the backdating scheme at the time he flew from the United States to Israel. (<u>Id.</u> ¶ 5.) It is also more likely than not that his counsel informed him of the arrest warrant in a telephone conversation with him or when his counsel visited him in Namibia. (<u>See</u> Nandan Decl. ¶¶ 6, 18.) Finally, this case has received significant media attention and it would be difficult to believe that Kobi had not learned of the warrants through media reports of them. (<u>See, e.g.</u>, Steve Stecklow, <u>Executive Retreat: Stock-Options Scandal Fugitive Puts Roots Down in Namibia—Comverse CEO Kobi Alexander Buys a Golf-Course Home, Invests in Auto-Body Shop—Fighting Extradition to U.S.</u>, Wall St. J., Nov. 17, 2006 at A1 (2,676 word front-page article describing the Alexanders' life in Namibia in detail).

Third, this forfeiture action is directly related to the criminal case because both arise out of the same alleged fraud scheme. (<u>Compare</u> Nandan Decl. Exh. 1 (<u>United States v. Jacob Alexander</u>, 06-CR-628, Superseding Indictment) <u>with</u> Nandan Decl. Exh. 2 (Verified Complaint *In Rem*). <u>See also</u> Morvillo Aff. ¶ 5 ("Both this case and the related criminal case arise out of the alleged backdating of employee stock option grants at Comverse[.]").)

Fourth, Kobi is not confined or otherwise in custody in any other jurisdiction so as to prevent him from returning to the United States to face the criminal charges against him. Although he was arrested in Namibia, that was in response to the United States' request that he be extradited. (Nandan Decl. ¶ 15.) He is currently free on bond pending the resolution of the extradition proceeding. (<u>Id.</u> ¶¶ 15, 17.) There is absolutely no basis for concluding that Kobi is not free to return to the United States to face the criminal charges against him. <u>See</u> <u>Collazos</u>,

368 F.3d at 201 (district court did not abuse its discretion in finding that fugitive claimant was not in custody of foreign sovereign where "nothing in the record indicate[d] that [claimant] was ever confined, incarcerated, or otherwise unable to travel to the United States of her own volition in the months before the district court ordered disentitlement.")  This prong is satisfied where an individual is being detained in a foreign country only because the foreign sovereign is seeking to extradite the individual pursuant to a United States arrest warrant.  United States v. All Right, Title and Interest in Real Property, Appurtenances, and Improvements Known as 479 Tamarind Drive, Hallandale, Florida, No. 98 Civ. 2279 (RLC), 2005 WL 2649001 ("Tamarind Drive"), at *3 (S.D.N.Y. Oct. 14, 2005) ("The Canadian authorities arrested [claimant] in order to expel him from the country, and not because he committed an offense within their jurisdiction. Therefore, the conditions of his release on bond do not preclude the court from subjecting [claimant] to fugitive disentitlement.").

Fifth, Kobi has clearly declined to re-enter the United States.  As a result, all five elements of the statutory fugitive disentitlement doctrine have been easily satisfied.  Again, even Kobi does not dispute this proposition.  Instead, Kobi argues that the fugitive disentitlement doctrine is discretionary and the court should decline to exercise its discretion to disentitle him. (Kobi Standing Opp. at 17-19.)  Kobi also argues that fugitive disentitlement would violate his Fifth Amendment Right not to be deprived of property without due process and his Eighth Amendment right not to be subject to excessive fines.  (Id. at 19-24.)  Each of these arguments will be considered in turn.

### 1. Discretionary Considerations

The statutory fugitive disentitlement doctrine does not provide any guidance as to factors courts should consider in exercising their discretion. Similarly, courts that have considered whether to apply the statutory fugitive disentitlement doctrine appear to have uniformly concluded that it should be applied without enumerating any specific factors which the courts considered in exercising their discretion.[11]  See, e.g., Tamarind Drive, 2005 WL 2649001, at *3 (disentitling fugitive because "[a]s a fugitive from justice, [claimant] 'has demonstrated disrespect for the legal process that he has no right to call upon the court to adjudicate his claim.'") (quoting Ortega-Rodriguez v. United States, 507 U.S. 234, 246 (1993)); United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck, 357 F. Supp. 2d 1321, 1328-32 (S.D. Ala. 2005) (disentitling fugitive after rejecting his argument that a medical condition and the weakness of the Government's case weighed against disentitlement); United States v. All Right, Title and Interest in Real Property and Appurtenances Located at Trump World Towers, No. 03 Civ. 7967 (RCC), 2004 WL 1933559, at *3 (S.D.N.Y. Aug. 31, 2004) (disentitling fugitive and stating that fugitive "may not use the resources of this Court to pursue a civil forfeiture claim while simultaneously evading jurisdiction to avoid sanction in the related criminal case against him."); see also Collazos, 368 F.3d at 201 (affirming district court's decision to disentitle fugitive without announcing any specific factors that courts should consider in making such a

---

[11] In United States v. $40,877.59, 32 F.3d 1151 (7th Cir. 1994), cited by Kobi, the court held that, as a matter of law, the doctrine of fugitive disentitlement could not be applied to civil forfeiture cases that are related to the criminal proceeding which the claimant is avoiding.  Since $40,877.59, the Supreme Court reached a similar outcome for different reasons, Degen v. United States, 517 U.S. 820 (1996), and Congress adopted CAFRA, granting courts the discretion to disentitle fugitives in civil forfeiture actions and, in doing so, abrogating $40,877.59.  It is clear that $40,877.59 is no longer good law.

determination, but stating that the fact that Section 2466 is discretionary "permit[s claimant] to present the district court with any facts and circumstances that might indicate that justice was not served by disentitlement in [claimant's] case.").

Kobi asks this court to consider only one factor in deciding whether to apply the fugitive disentitlement doctrine:  the merits of the Government's civil forfeiture claim.  It appears that the only court to have considered the issue has concluded that the fact that the Government's case is weak does not weigh in favor of permitting a fugitive to press his claim in federal court.  In United States v. One 1988 Chevrolet Cheyenne Half-Ton Pickup Truck, the court held that "[e]ven if [claimant] were correct that the case against him is relatively weak, this point would not militate in favor of the Court allowing his claim and declining to apply the fugitive disentitlement provisions of [CAFRA]."  Id., 357 F. Supp. 2d at 1332.  The court explained that "[s]urely, the prospect of a weak federal case would provide [claimant] with all the more incentive to return to the United States to clear his name and vindicate his purported property rights as to the *in rem* defendants."  Id.

I generally agree with the 1988 Chevrolet Cheyenne court.  The mere fact that the face of the Complaint does not suggest that a case has merit does not weigh in favor of declining to apply the fugitive disentitlement doctrine to a civil forfeiture claimant.  In many cases, at the time a fugitive disentitlement motion is brought, the Government's investigation is ongoing and the Government will not have had an opportunity to gather a large body of evidence.  In no way does such a scenario support permitting a fugitive to press his claim.  A claim takes time to investigate and, in its initial stages, it is not always easy to discern whether the claim has merit.  Cf. Supplemental Rule G(8)(b)(ii) ("In an action governed by 18 U.S.C. § 983(a)(3)(D) the

33

complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."). If Congress had wanted to require the Government to make a certain threshold showing that its civil forfeiture claim had merit before the fugitive disentitlement doctrine was applied, it could have required that such a showing be made. Congress, however, enacted no such requirement. This is not to suggest that a court should never consider the merits of the civil forfeiture claim in determining whether to apply the disentitlement doctrine. If there is evidence that the Government is overreaching or that the criminal charges were brought for the purpose of bolstering a related civil forfeiture case, see 146 Cong. Rec. S1753-02, *S1761 (March 27, 2000) (Senator Leahy) ("Opponents of the fugitive disentitlement doctrine say that the prosecutors have gone so far as to indict people whom they know will never return to this country, so that they can invoke the doctrine in civil forfeiture proceedings against such persons' U.S. assets."), it may be appropriate to consider the merits of the civil forfeiture case in determining whether to apply the disentitlement doctrine. In this case, there is no reason to consider the merits of the Government's case in determining whether to bar Kobi from pursuing his claim.

Even if this court were to consider the merits of the Government's case, there is no basis for concluding that the Government's case is weak considering the early stage of this litigation. Claimants' arguments that the Government has failed to state a claim have been considered in detail *supra*. While it is unclear whether the Government is pursuing the first cause of action in its current form and there appear to be defects in the second cause of action (most notably, the Complaint lacks an allegation as to how many backdated options or Comverse shares resulting from the exercise of backdated options were deposited into the 338 Account) that will be cured

by amending the Complaint, there is nothing to suggest that the claim lacks merit at this stage. In fact, the Government has cited significant facts that support its second cause of action in its brief in opposition to Claimants' motion to dismiss. Further, the Government has identified additional civil forfeiture theories which also appear to have merit. Thus, even if I found it appropriate to consider the merits of the Government's case in determining whether to apply the fugitive disentitlement doctrine, this factor does not weigh in favor of permitting Kobi to pursue his claim.

Nor can I identify any other factor which weighs against applying the doctrine in this case. Kobi is clearly a sophisticated businessman represented by competent counsel. The Superseding Indictment charges Kobi with thirty-five counts of serious criminal conduct, including securities fraud, mail fraud, wire fraud, money laundering, bribery, and witness tampering. (Nandan Decl. Exh. 1.) Although this court is not privy to the details of schemes by other corporations to issue backdated stock options, it may be that the scheme Kobi is alleged to have masterminded is even more egregious than many of these other schemes. The Superseding Indictment alleges that Kobi caused other Comverse employees to specifically represent to Comverse's institutional investors that it would not issue in-the-money options, which Kobi knew those investors were opposed to issuing. (Id. ¶¶ 42-43.) Further, Kobi is alleged to have, "together with others, used fictitious names to generate hundreds of thousands of backdated options, which the conspirators then parked in a secret slush fund designed to evade the requirements of CTI's stock option plans." (Id. ¶ 17.) The only two other Comverse officers to have been charged in the instant stock option backdating scheme have pled guilty before this court.

Kobi has not offered any explanation for his sudden decision to relocate his family to Namibia. Nor does anything about the circumstances of his move suggest any explanation for the move other than that it was made for the express purpose of avoiding this court's jurisdiction. On or about June 21, 2006, Kobi flew from the United Stats to Israel. (Nandan Aff. ¶ 5.) At that time, he was aware of the United States Attorney's investigation into the Comverse backdating scheme. (Id.) Since Kobi is an Israeli citizen, there is nothing suspicious about this trip in and of itself. However, in July 2006, Kobi wired $57,000,000 from the 338 Account to accounts in Israel. (Id. ¶ 7.)

Kobi, through counsel, assured the Government that he would return to the United States on July 28, 2006. (Id. ¶ 6.) Instead, Kobi attempted to wire an additional $12,000,000 from the United States on July 31, 2006. (Id. ¶ 10.) However, a Warrant for the Arrest of Articles *In Rem* was issued on July 31, 2006, and Kobi was unable to remove this additional $12,000,000. At this time, more than one year has passed since Kobi assured the Government he would return to the United States, and he has yet to return.

Instead, Kobi is challenging efforts to extradite him from Namibia. Kobi argues that applying the fugitive disentitlement doctrine would have the effect of "penaliz[ing] Mr. Alexander for asserting his rights under the laws of Namibia." (Kobi Standing Opp. at 14.) Kobi is largely correct on this point. As enacted by Congress, the fugitive disentitlement doctrine permits courts to "penalize" those who knowingly fail to return to the United States to face criminal charges. Undoubtedly some of the people who are penalized as a result of CAFRA will be exercising a right under a foreign country's law to remain in that country. In this case, it is not entirely clear what substantive rights Kobi has to remain in Namibia. Nor is it clear to this

court precisely what procedures or criteria Namibia uses to determine whether it will extradite an individual that has been charged by the United States with very serious crimes.

In short, the seriousness of the allegations against Kobi coupled with his continuing efforts to keep himself and his assets outside of the jurisdiction of United States courts leads this court to conclude that it should exercise its discretion to apply the fugitive disentitlement doctrine and bar Kobi from pursuing his claim to the seized assets in this court.

### 2.     Due Process Rights

Kobi's argument that application of the fugitive disentitlement doctrine will violate his Fifth Amendment right not to be deprived of property without due process fails. Kobi does not cite a single case in support of his argument. Instead, he merely attempts to distinguish the Second Circuit's decision in United States v. Collazos, 368 F.3d 190 (2d Cir. 2004), where the court held that "when persons knowingly refuse to produce themselves in the United States to answer criminal charges, Congress acts within its power and does not violate due process by authorizing courts to disallow their challenges in related civil forfeiture proceedings." Id. at 204.

Kobi attempts to distinguish Collazos by arguing that the fugitive there (1) had violated numerous discovery orders before the doctrine was applied and (2) was not the subject of an extradition proceeding. Nothing about the reasoning of Collazos, however, suggests that these are permissible bases for distinguishing that decision. The Collazos court explained that there was no basis for reconsidering prior Second Circuit decisions which had held that "a person who refuses to appear in this country for arraignment on criminal charges of which he has notice thereby waives his due process rights in related civil forfeiture proceedings." Id. at 202 (internal quotation marks omitted). The court continued to explain that, under Supreme Court precedent,

CAFRA's fugitive disentitlement doctrine is nothing more than a presumption that does not raise

due process concerns:

> By authorizing § 2466 disentitlement, Congress imposed a
> presumption in civil forfeiture cases of the sort approved in
> [Hammond Packing Co. v. Arkansas, 212 U.S. 322 (1909)].
> Specifically, when persons, such as [claimant], refuse to enter the
> United States to face criminal charges, but simultaneously attempt
> to challenge related civil forfeitures by asserting innocent-owner
> defenses, the claimant's deliberate absence from the United States
> gives rise to a presumption that there is no merit to the innocent-
> ownership claim.  Indeed, in many cases, certainly in [claimant's],
> the presumption is reinforced when the claimant's absence
> deprives the government of the opportunity to conduct a
> deposition, which itself supports an adverse inference as to the
> criminal source and use of the seized currency.  [Claimant]
> concedes that an adverse inference could have been drawn from
> her failure to submit to deposition; nevertheless, she insists that
> due process only permitted an inference, not disentitlement.  But
> that is not the holding in Hammond.  There too, the party's failure
> to produce ordered material could simply have given rise to an
> adverse trial inference, but the Supreme Court ruled that a
> legislature acted within its power, and did not deprive a litigant of
> due process, when it used the adverse inference as a basis for
> requiring dismissal of a non-complying party's answer and the
> entry of a default judgment.  For the same reason, we conclude that
> when persons knowingly refuse to produce themselves in the
> United States to answer criminal charges, Congress acts within its
> power and does not violate due process by authorizing courts to
> disallow their challenges in related civil forfeiture proceedings.

Id. at 203-04 (internal citation omitted).  It is clear that the Collazos court's decision that Section

2466 does not violate the Due Process Clause did not depend on the fact that the claimant in that

case had failed to comply with their discovery obligations.  In short, applying the fugitive

disentitlement doctrine in this case will not violate Kobi's rights under the Due Process Clause.

### 3.    Excess Fines Clause

Kobi's argument that applying the fugitive disentitlement doctrine in this case would violate the Eighth Amendment's Excessive Fines clause presents also fails.  The parties agree that "[s]tatutory in rem forfeiture imposes punishment" and, as such, "is subject to the limitations of the Eight Amendment's Excessive Fines Clause."  Austin v. United States, 509 U.S. 614, 622 (1993).  A fine violates the Excess Fines Clause when it is "'grossly disproportional to the gravity of a defendant's offense.'"  United States v. Collado, 348 F.3d 323, 328 (2d Cir. 2003) (quoting United States v. Bajakajian, 524 U.S. 321, 334 (1998)).  In determining whether a fine meets this standard, courts consider:  "(a) 'the essence of the crime' of the respondent and its relation to other criminal activity, (b) whether the respondent fit into the class of persons for whom the statute was principally designed, (c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by the respondent's conduct."  Id. (quoting and citing Bajakajian, 524 U.S. at 337-39).

Both parties recognize that 18 U.S.C. § 983(g) requires the court to determine whether a forfeiture violates the Eighth Amendment after holding a hearing on the issue.  (Kobi Standing Opp. at 23-24; Gov't Standing Rep. at 7.)  Courts hold such a hearing after a determination is made on the merits of the Government's forfeiture claim.  See, e.g., United States v. 32 Medley Lane, No. 3:01CV2290 (MRK), 2005 WL 465421, at *2 (D. Conn. Feb. 11, 2005) ("If the jury concludes that the Defendant Property is subject to forfeiture and that neither Claimant is an innocent owner, the Court cannot enter a judgment of forfeiture without first considering Claimants' contention that forfeiture of the Defendant Property violates the Constitution.  See 18 U.S.C. § 983(g).  Therefore, if necessary, the Court intends to conduct a post-trial evidentiary

proceeding following the jury's verdict on the issue of excessiveness under CAFRA and Eighth Amendment case law.")  Theoretically, it may be possible to construe Section 983(g) to permit the court to determine, as a matter of law, that a civil forfeiture claim, if proven, would violate the Eighth Amendment on the basis of the pleadings alone.  Even if that were true, in this case, it simply is not possible to determine whether the forfeiture that the Government is seeking is "grossly disproportional" to Kobi's alleged offenses because there is no basis, at this early stage, for determining the gravity and magnitude of the alleged offenses.

Further, nothing about Kobi's rights under the Excessive Fines Clause precludes imposition of the fugitive disentitlement doctrine because, by failing to appear to face the criminal charges against him, Kobi has waived his rights to press his Excessive Fines claim.  As discussed *supra*, the Second Circuit in Collazos clearly held that "[the claimant] voluntarily waived her right to be heard in the civil forfeiture action by refusing to appear in the related criminal case."  Collazos, 368 F.3d at 202.  The court explained that "[Claimant] was denied a hearing on *her* terms, but a hearing was certainly available to her on the terms established by Congress."  Id. at 203.  Although the Collazos court was confronting the specific issue of whether CAFRA violated a property owner's due process rights, the Collazos court's reasoning applies just as well in the context of the Excessive Fines Clause.  Under CAFRA, a fugitive waives his right to press any claims and defenses in a related civil forfeiture action.  The fact that in certain cases the fugitive will lose a right to press a constitutional claim, such as an Excessive Fines Clause claim, as opposed to a statutory claim, such as an innocent owner defense, is of no moment.  As a result, nothing about the fact that Kobi asserts the Government's civil forfeiture claims would violate the Excessive Fines Clause precludes imposition of the fugitive

40

disentitlement doctrine in this case.

*     *     *

In summary, I find that (1) the elements of the statutory fugitive disentitlement doctrine have been satisfied as a matter of law, (2) imposition of the doctrine is warranted in this case, and (3) nothing about imposition of the doctrine in this case will violate Kobi's constitutional rights. Thus, the Government's motion for summary judgment with respect to its fugitive disentitlement doctrine claim is granted.

## III.    CONCLUSION

For the reasons set forth above: (1) (a) the Government's motion to strike both Claimants' statements of interest on the ground of lack of statutory standing is denied and (b) the Government's motion to strike Hana's statement of interest is held in abeyance pending further discovery and briefing; (2) Claimants' motion to dismiss is denied; however, the Government is directed to amend the Complaint on or before October 1, 2007; and (3) the Government's motion for summary judgment with respect to its fugitive disentitlement claim is granted.

Because (1) the Government has not argued that the Government's motion for summary judgment with respect to the fugitive disentitlement doctrine issue should be heard prior to Kobi's motion to dismiss and (2) some of the objections to the Complaint that Kobi raised in support of his motion to dismiss will not be fully adjudicated until an amended complaint resolving the objections is filed or the objections are resolved on a subsequent motion to dismiss, I shall stay my decision to grant the Government summary judgment on the fugitive disentitlement issue pending the filing of an amended complaint and any motion to dismiss the amended complaint. The Government shall file and serve an amended complaint no later than

41

October 1, 2007.  Claimants may answer or move to dismiss the amended complaint within the time permitted by the Supplemental Rules.  No pre-motion conference is required for any motion to dismiss.  Once Claimants have answered the amended complaint or the court has ruled on a motion to dismiss, the court shall lift its stay on its ruling on the fugitive disentitlement issue.

Discovery on the issue of whether Hana has standing under Article III of the Constitution shall commence immediately and shall be completed by October 12, 2007.  Although depositions may not be necessary, the Government is free to depose Hana on this issue.  Any and all depositions shall occur in the Eastern District of New York.  If, after discovery, there is still a dispute as to whether Hana has standing, the parties shall brief the issue.  On or before October 17, 2007, Hana shall submit a letter-brief not exceeding five pages in length in support of her claim that she has standing.  Hana shall also submit any affidavits, documents, and/or other factual evidence supporting her standing claim.  On or before October 22, 2007, the Government shall submit a letter-brief not to exceed five pages in length in opposition to Hana's standing claim.  The Government is also free to make a factual submission if it so desires.

SO ORDERED.

Dated: September 10, 2007                                    /s/ Nicholas G. Garaufis
          Brooklyn, N.Y.                                      NICHOLAS G. GARAUFIS
                                                             United States District Judge