UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,　　　　　　　　　　MEMORANDUM & ORDER

　　　　　　　　　　　　Plaintiff,　　　　　　　　06-CV-3730 (NGG)

　　-against-

ALL FUNDS ON DEPOSIT AT: CITIGROUP
SMITH BARNEY ACCOUNT No. 600-00338
HELD IN THE NAME OF KOBI ALEXANDER
and CITIGROUP SMITH BARNEY ACCOUNT
No. 600-27694 HELD IN THE NAME OF
KOBI J. ALEXANDER,

　　　　　　　　　　　　Defendants.
----------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

　　Plaintiff United States of America (the "Government") brings this civil forfeiture action against Defendants Citigroup Smith Barney Account No. 600-00338 (the "338 Account") and Citigroup Smith Barney Account No. 600-27694 (the "694 Account") (collectively, the "Defendant Accounts") seeking forfeiture of funds totaling approximately $49 million. Jacob "Kobi" Alexander ("Kobi") and his wife Hana Alexander ("Hana") (collectively, "Claimants") have filed statements of interest respecting the Defendant Accounts. (Docket Entries ## 88-89.) In a Memorandum and Order dated September 10, 2007 the court, *inter alia*, directed the Government to amend its Complaint. (Memorandum & Order ("Sept. 10, 2007 Order"), Docket Entry # 80.) In a Memorandum and Order dated June 18, 2008, the court granted the Government leave to amend its Amended Complaint in order to incorporate into it allegations that were previously contained only in an attached Superseding Indictment. (Memorandum & Order, Docket Entry # 125.)

　　The Government has now filed its Second Amended Verified Complaint In Rem

("SAVC"). (Docket Entry # 128.) Claimants now move to dismiss the SAVC on numerous grounds. For the reasons stated below, Claimants' motions to dismiss are denied. In addition, the court's stay of its previous ruling on the Government's motion to disentitle Kobi from pursuing a claim to the Defendant Accounts as a fugitive is lifted. (See Sept. 10, 2007 Order at 41-42.) Kobi's statement of interest is therefore stricken.

**I.     The SAVC**

The SAVC alleges that, beginning in 1991, Kobi, the CEO of Comverse Technology Inc. ("CTI") engaged with others in a scheme to defraud investors in CTI predicated on backdating of CTI's stock option grants to days when CTI's stock was trading at periodic low points. (SAVC ¶¶ 5, 7, 8, 14.) The SAVC alleges that the scheme violated the criminal prohibitions against conspiracy and mail, wire, and securities fraud. (Id. ¶¶ 9-13, 46-57.) It alleges, for instance, that failing to properly account for backdated options generally overstates profit and understates compensation expense and that backdating options violated the terms of CTI's stock option plans. (Id. ¶¶ 11-12.)

The SAVC alleges that Kobi backdated every company-wide grant after 1998 as well as six other option grants, numbered 7, 837, 1125, 1134, 1593, and 35803, and that he received more backdated options from CTI than any other person. (Id. ¶¶ 14, 61.) The SAVC also alleges that Kobi made false statements, misrepresentations, and material omissions in CTI's proxy statements, annual and quarterly filings, and stock option plans that concealed the existence of the backdating scheme. (Id. ¶¶ 25, 27-44.) The proxy statements, stock option plans, and annual filings were sent by mail to CTI's shareholders. (Id. ¶ 26.) Additionally, unanimous consent forms approving the backdated options were sent by mail to members of CTI's Board of

Directors. (Id. ¶ 54.) CTI's annual and quarterly filings and its proxy statements were filed by wire with the SEC in Washington, D.C. (Id. ¶¶ 26, 57.) Unanimous consent forms were sent by fax to members of CTI's Board of Directors, and several e-mails were sent between CTI employees about the backdated options. (Id. ¶ 57.)

Kobi deposited more than a million CTI shares he acquired by exercising backdated stock options issued to him in option grants 7, 837, 1125, 1134, and 35803 into the 338 Account. (Id. ¶¶ 60-61.) He later sold those shares, realizing $72,059,395.29. (Id. ¶ 61.) On or about January 28, 2004, Kobi opened the 694 Account and funded it with $1 million from the 338 Account. (Id. ¶ 64.) Kobi later transferred an additional $4 million from the 338 Account into the 694 Account. (Id.) These transfers occurred soon after Kobi sold for $5.1 million a block of shares in the 338 Account that were acquired through the exercise of backdated stock options. (Id.)

On June 21, 2006, Kobi flew to Israel. (Id. ¶ 65.) At that time he was already aware that he was under investigation by the United States Attorney's Office for the Eastern District of New York (the "USAO") for his involvement in the backdating scheme. (Id.) Kobi's lawyers told the USAO in July that Kobi would be returning to the United States on July 28, 2006. (Id. ¶ 66.) On July 25, 2006, Kobi transferred approximately $7 million from the 694 Account (from which he could not withdraw funds directly) into the 338 Account. (Id. ¶ 68.) During the month of July, Kobi transferred $58 million from the 338 Account to two accounts at Bank Leumi and Bank Hapoalim in Israel. (Id. ¶ 70.) Kobi subsequently transferred millions of dollars of the funds transferred to Bank Leumi to banks in other countries, including Namibia and Cyprus, from which they were subsequently transferred into other accounts and trust accounts. (Id. ¶¶ 72-87.) On July 26, 2006, for example, a bank check in the amount of $12 million drawn upon Kobi's

3

account at Bank Leumi was deposited into an account at Standard Bank in Windhoek, Namibia. (Id. ¶ 72.) Kobi opened this account on July 21, 2006 using a newly issued Israeli passport. (Id.)

Kobi did not return to the United States on July 28, 2006. (Id. ¶ 75.) Instead, on or before that date he flew to Namibia, which at that time did not have an extradition treaty with the United States. (Id.) On July 31, 2006, the Defendant Accounts were seized based on a Warrant for the Arrest of Articles *In Rem* issued by Magistrate Judge Cheryl L. Pollak. (Id. ¶ 76.) The issuance of this Warrant blocked an attempt by Kobi to wire an additional $12 million from the 338 Account out of the country. (Id. ¶ 78.) At the time the 694 Account was seized, it contained fewer than $4 million. (Id. ¶ 69.)

On September 20, 2006 a Grand Jury in the Eastern District of New York returned a thirty-two count indictment against Kobi. (Id. ¶ 79.) On September 27, 2006, Kobi was arrested in Namibia pursuant to a provisional arrest warrant issued by the Namibian courts at the request of the United States. (Id. ¶ 80.) He was subsequently released on bail. (Id.) The Government's request to extradite Kobi is currently pending in the Namibian courts. (Id.)

## II.  THE GOVERNMENT'S SIX FORFEITURE CAUSES OF ACTION

The Government alleges in its first cause of action that the Defendant Accounts are subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because they were involved in money-laundering transactions in violation of 18 U.S.C. § 1956. (Id. ¶¶ 91-93.) In its third cause of action, the Government alleges that the Defendant Accounts are also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because they contain proceeds of specified unlawful activity: mail, wire, and securities fraud and conspiracy to commit mail, wire and securities fraud. (Id. ¶¶ 97-98.) In its fifth cause of action, the Government alleges that the Defendant Accounts are subject

4

to forfeiture under 18 U.S.C. § 981(a)(1)(A) because they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, which prohibits certain knowing transactions or attempted transactions in criminally derived property. (Id. ¶¶ 101-102.) The Government's second, fourth, and sixth causes of action are "substitute assets forfeiture" counts under 18 U.S.C. § 984, under which the Government seeks to seize any identical property found in the same place or account as the funds subject to forfeiture under the first, third, and fifth causes of action. (Id. ¶¶ 94, 96, 99-100, 103-04.)

### III.     STANDARD OF REVIEW

The Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules") govern this civil forfeiture proceeding. Supplemental Rule G(2)(f) requires the complaint in a civil forfeiture proceeding to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

### IV.     THE MONEY LAUNDERING CAUSES OF ACTION

The government alleges in its first cause of action that the Defendant Accounts were involved in money laundering transactions or attempted money laundering transactions that violated 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), and that the Defendant Accounts are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1) as "property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

§§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i) require a showing that the person conducting or attempting to conduct the transaction at issue knew that it was "designed in whole or in part to

5

conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

Claimants argue that the government has not adequately alleged either that the transactions at issue (1) involved proceeds of specified unlawful activity or (2) were designed to conceal "the nature, the location, the source, the ownership, or the control of" such proceeds.

### A. Proceeds of Specified unlawful activity

The term "specified unlawful activity," as defined in § 1956(c)(7), generally includes "any act or activity constituting an offense listed in section 1961(1)." Among the offenses listed in § 1961(1), in turn, are acts indictable under 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) and "fraud in the sale of securities." The court will consider first whether the SAVC properly alleges any specified unlawful activity, and then whether the SAVC properly alleges that the transactions at issue involved proceeds of specified unlawful activity.

#### 1. Specified Unlawful Activity

##### a. "Fraud in the sale of securities"

Claimants argue that the securities fraud allegedly committed involved only the *acquisition* of options to purchase CTI stock and the subsequent use of those options to *acquire* CTI stock, and that there was therefore no "sale" of securities. (Cl. Br.[1] at 12 n.11.) The court disagrees. Even if the phrase "fraud in the sale of securities" applies only to sales of securities,

---

[1] The memoranda filed by the parties will be cited as follows. Claimants' opening memorandum (Docket Entry # 109) will be cited as "Cl. Br." The Government's memorandum in response (Docket Entry # 116) will be cited as "Gov't Br." Claimants' reply memorandum (Docket Entry # 117) will be cited as "Cl. Rep." The Government's supplemental memorandum (Docket Entry # 134) will be cited as "Gov't Supp." Claimants' supplemental memorandum (Docket Entry # 130) will be cited as "Cl. Supp."

see, e.g., United States v. Deeb, 175 F.3d 1163, 1166-68 (9th Cir. 1999), and not also to purchases, the SAVC alleges that fraud was committed in both the sale and purchase of securities. It alleges, for example, that Kobi on numerous occasions caused CTI to issue him backdated options. (SAVC ¶¶ 14, 61.) If Kobi's acquisition of options issued by CTI constituted a purchase of securities, the issuance of such options by CTI constituted a sale of securities. Therefore, because the SAVC adequately alleges the other elements of securities fraud,[2] see 3 L. Sand, et al., Modern Federal Jury Instructions—Criminal, at ¶ 57.20 (2008), the SAVC properly alleges fraud in the sale of securities, a specified unlawful activity within the meaning of 18 U.S.C. § 1961(1).

        b.      Mail and Wire Fraud

In their opening brief, Claimants argued that the Amended Complaint failed to sufficiently allege violations of the mail and wire fraud statutes. (Cl. Br. at 14-16.) In their supplemental brief, Claimants appear to concede that the Government has now adequately pleaded violations of those statutes. In any case, the court finds that the SAVC adequately alleges all of the elements of the mail and wire fraud statutes: (i) a scheme to defraud (ii) to get

---

[2] While Claimants contend that the SAVC does not adequately allege Kobi's scienter, there can be no serious argument about the sufficiency of the Government's allegations. The facts and circumstances alleged in the SAVC that support a reasonable belief that the Government will be able to prove that Kobi acted with specific intent to defraud include (i) Kobi's background in finance (SAVC ¶ 7), (ii) Kobi's role in causing CTI to issue backdated options (id. ¶¶ 15-19, 48), (iii) Kobi's substantial personal profit from the backdated options (id. ¶¶ 14, 61), (iv) Kobi's creation of a slush fund full of options granted to fictitious employees (id. ¶¶ 20-24); (v) Kobi's signing of statements that were clearly false and misleading (id. ¶¶ 25-45, 48); (vi) Kobi's role in causing false statements to be made to institutional investors regarding CTI's options-granting practices (id. ¶ 45); (vii) Kobi's offer to another person of $5 million in exchange for taking responsibility for the options-backdating scheme (id. ¶ 58); and (viii) Kobi's efforts to avoid apprehension and his status as a fugitive from justice (id. ¶¶ 65-82).

money or property, (iii) furthered by the use of interstate mail or wires. United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000). The SAVC pleads facts and circumstances that support a reasonable belief that the Government will be able to prove that Kobi knowingly made false and misleading statements to investors in the service of a scheme to backdate options whose goal was to obtain improperly backdated options,[3] and that Kobi used both the mails and the wires in furtherance of the scheme.

2. Proceeds of Specified Unlawful Activity

Claimants argue that, even if the Government has properly alleged that specified unlawful activity was committed, it has not alleged that the funds in the Defendant Accounts are the proceeds of alleged specified unlawful activity.

> Claimants argue that the funds in the Defendant Accounts do not derive from:
>
> the accounting or the alleged false statements, but from the exercise of some of the allegedly backdated options. The exercise of the options is an action totally separate and independent from any purported accounting flaws or false statements in SEC filings, and therefore forms no part of the misconduct alleged in the Amended Complaint."

(Cl. Br. at 1.) This argument takes an unjustifiably narrow view of the Government's allegations. The Government alleges the existence of an integrated scheme which involved false statements and accounting flaws and whose goal was to obtain backdated options. (See SAVC ¶¶ 8, 14.) The statements at issue would not have been false if no backdated options were issued, and there would have been nothing improper about the backdated options if they were adequately disclosed to CTI's investors. To consider the false statements without the backdated options therefore makes no sense, as they were inextricably intertwined with one another.

---

[3] See supra note 2.

The same conclusion disposes of Claimants' argument that backdating in and of itself is not a "specified unlawful activity" and that the Government's allegation that funds in the Defendant Accounts were the proceeds of the backdating scheme proves nothing. (Cl. Br. at 13.) The Government has properly alleged that the backdating scheme at issue here *was* a specified unlawful activity, because it violated the mail and wire fraud statutes, and constituted fraud in the sale of securities.[4]

Another argument put forth by Claimants regarding the purported lack of a "nexus" between the specified unlawful activity alleged in the SAVC and the funds in the Defendant Accounts relies on an affidavit from Harvey R. Kelly, a Certified Public Accountant who performed an analysis of CTI's stock-option compensation practices. (Affidavit of Robert G. Morvillo (Docket Entry # 110) Exh. J) ¶ 3.) According to Claimants, this affidavit demonstrates that Kobi did not exercise any of the backdated options issued in or after 1998, the period for which the SAVC includes specific allegations that Kobi caused CTI to make false and misleading statements relating to CTI's grants of stock options.

On a motion to dismiss, the district court's consideration is "limited to the factual allegations in [the] amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may

---

[4] Claimants also argue that the Government's allegations do not show that Kobi received "the options through backdating; it merely alleges that the options that he received were *more valuable* because of the purported backdating." (Cl. Supp. Br. at 5.) This argument is merely a restatement of Claimants' argument that the Government may seek only net proceeds, not gross proceeds, and that it should be able to seize only the profit that is traceable to the difference in the exercise price of the options that resulted from the backdating. As discussed below, Claimants' argument regarding whether the Government may recover gross or only net proceeds under 18 U.S.C. § 981(a)(1)(A) will not be considered at this time.

9

be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993). Claimants offer no argument as to why the court should consider this affidavit on a motion to dismiss, and the court can conceive of no reason why it should. The court will therefore not consider the affidavit submitted by Claimants.[5]

The court may, however, still consider the general point made by Claimants, that the SAVC does not link the precise option grants whose proceeds ended up in the Defendant Accounts to any misleading statements allegedly made by Kobi or anyone else at CTI. That is, the SAVC alleges that the funds in the Defendant Accounts were the proceeds of backdated options, but it does not allege that those specific backdated options were the subject of any specific false or misleading statements and thus the proceeds of specified unlawful activity. As such, Claimants argue that it is logically possible that those option grants were entirely proper and that CTI's investors were fully informed that they were backdated. As noted above, at this stage of the litigation the Government need only "state sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of proof at trial." Supplemental Rule G(f)(2). The Government has alleged with great specificity that a backdating scheme that constituted specified unlawful activity occurred, and it has alleged that the funds in the Defendant Accounts were obtained through the exercise of backdated options obtained as a result of that scheme. Although it is possible, as Claimants argue, that the Government will not ultimately be able to prove any connection between the funds in the Defendant Accounts and the

---

[5] For the same reason, the affidavit supplied to the court by Robert G. Morvillo on July 14, 2008 (Docket Entry # 131) is not properly before the court and will not be considered.

specified unlawful activity, the Government has met its burden at this stage of the litigation.

B.     **Design to Conceal**

In addition to requiring the Government to allege that a transaction involved proceeds of specified unlawful activity, both §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i) require an allegation that the transaction or transfer of funds involving proceeds of specified unlawful activity was "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity." See Cuellar v. United States, 128 S. Ct. 1994, 2003-04 (2008).

The Government has alleged that Kobi transferred millions of dollars from the Defendant Accounts to accounts in Israel while he knew he was under investigation by the USAO. It has further alleged that Kobi arranged for his attorneys to inform the USAO that he would be returning to the United States, even though in fact Kobi was moving to Namibia where he became a fugitive from justice.

These allegations are sufficient to support a reasonable belief that Kobi's purpose in transferring the funds was to conceal their location, given the likelihood that the Government would have moved earlier to seize the funds had it been aware that Kobi was moving funds out of the country and did not intend to return to the United States. One can easily infer from these allegations that Kobi sought to conceal the location of these funds to avoid efforts to seize them.[6]

---

[6] Claimants argue that the transfers at issue were straightforward transfers between accounts all held in Kobi's name, and that there are therefore no indicia of secrecy indicative of concealment. (Cl. Br. at 20, 22.) What makes these transfers potentially violative of 18 U.S.C. § 1956, however, is their timing and the circumstances under which they were made, not the manner in which the funds were transferred. Even straightforward transactions can violate § 1956; the statute does not only criminalize the employment of convoluted methods to disguise one of the listed attributes. Here, Kobi's surreptitious transfers of funds were quite successful, as

Since location is one of the attributes listed in § 1956, and because the Government has alleged facts that support a reasonable belief that it will be able to meet its burden of proof at trial, the Government's allegations as to concealment are adequate.[7]

IV. **KOBI'S MOTION FOR RECONSIDERATION OF THE COURT'S DECISION ON FUGITIVE DISENTITLEMENT**

In its September 10, 2007 Order, the court found that fugitive disentitlement was warranted under 24 U.S.C. § 2466(a) and rejected Kobi's arguments that disentitlement would deprive Kobi of due process and violate the excess fines clause of the Eighth Amendment. It therefore granted the Government's motion for summary judgment on its fugitive disentitlement claim. (Sept. 10, 2007 Order at 27-42.) The court, however, stayed its ruling until either the Claimants filed an answer or the court ruled on the Government's motion to dismiss. Having ruled on Claimants' motion to dismiss, the stay is lifted, and so Kobi is disentitled from further

---

he was able to withdraw millions of dollars from the Defendant Accounts before the USAO became aware of his intentions to evade the jurisdiction of the Government.

[7] Claimants make numerous arguments that seek to limit the maximum amount of funds subject to forfeiture. They argue that only net, not gross, proceeds are subject to forfeiture under § 981(a)(1)(A). They also argue that only the $12 million that Kobi unsuccessfully attempted to transfer out of the country from the 338 Account is property that was "involved in a transaction or attempted transaction in violation of section 1956," and that the rest of the funds in the Defendant Accounts are not forfeitable under § 981(a)(1)(A). (Cl. Br. at 23.)

As all the funds in the Defendant Accounts are potentially subject to forfeiture under § 981(a)(1)(C), Claimants' arguments directed to the extent of forfeiture allowed under § 981(a)(1)(A) likely will not have any effect on the forfeiture ultimately achieved by the Government. Consideration of these arguments will therefore be deferred until it becomes apparent that their resolution is required.

Claimants' argument that the 694 Account is not subject to forfeiture because the Government has not demonstrated that any transfers into it were linked to the options-backdating, (see Cl. Supp. at 7 n.11), is rejected, as the Government's allegation that the initial deposit into the 694 Account followed close on the heels of a sale of stock in the 338 Account is sufficient to allow the Government to proceed against the 694 Account. (See SAVC ¶ 64.)

pursuing his claim to the Defendant Accounts. Kobi's statement of interest in the Defendant Accounts is therefore stricken.

Kobi's request that the court reconsider its ruling granting the Government's motion for summary judgment is denied. Although the court recognizes that it has the authority to reconsider its order, see United States v. LoRusso, 695 F.2d 45, 53 (2d Cir. 1982) ("[W]hether the case *sub judice* be civil or criminal, so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so"), the court declines to do so. The court thoroughly considered Kobi's arguments in its previous order, and continues to believe that Kobi's reading of Collazos v. United States, 368 F.3d 190 (2d Cir. 2004), upon which the court relied in its decision, is overly narrow.

## V. CONCLUSION

For the reasons stated above, Claimants' motions to dismiss are denied.[8] The court's stay of its ruling on the Government's motion to disentitle Kobi from pursuing a claim to the Defendant Accounts as a fugitive is lifted. Kobi's statement of interest is stricken and dismissed with prejudice.

SO ORDERED.

Dated: August 1, 2008  /s Nicholas G. Garaufis
      Brooklyn, New York  NICHOLAS G. GARAUFIS
        United States District Judge

---

[8] Claimants' arguments relating to the Government's substitute assets forfeiture causes of action under 18 U.S.C. § 984 will not be considered at this time because the court has not dismissed the Government's causes of action that require the Government to trace the funds in the Defendant Accounts to the specified unlawful activity at issue here. These arguments may be renewed if and when appropriate.